Okay, thank you. In case I forget to note at the end of the argument, we have asked Gregory to get a transcript, and so we'd ask that the transcript be ordered. I might forget that at the end of the argument. Ms. Matheson, you're ready to proceed? Good morning, Your Honor. Thank you. Good morning. With the Court's permission, I'd like to reserve five minutes for rebuttal. Five minutes, okay. Obviously, a very important and very, very difficult case is evidenced not by the nature of the prosecution, but the fact that we gave it 25 minutes as opposed to our usual 15. And frankly, I wouldn't be surprised if this goes from both your perspectives, well beyond the 25 minutes allotted. There are a number of issues to get to, almost all of them rather subtle and not that straightforward. So with that, I'll be quiet. I won't be quiet. Let me start out this way. In Kelly, which I've read, I can't tell you how many times, on page, what is this? 1543, I think it is the opinion of the Supreme Court of 1573. I'm sorry. The Court makes one statement, which I'm going to read to you, and I'm going to ask both of you to comment on this, followed by a second statement, which seems to confound in my mind the first thing. The Court says in the second column on the page, or put differently, if property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme. And that, Ms. Mathison, could be the topic of your brief. But then the Court goes on to say a little further down, the object of the scheme, the scheme in Kelly with the bridges, of the bridge was never to get the employees' labor. It was to get gaming licenses. I'm sorry, they're referring there to the scheme in Cleveland. But it seems to me, and they have in their footnote the example of somebody who comes up with a scheme to get a buddy to drive to a brick-and-morton and says the cost of the gasoline can't count toward the cost, doesn't make it a wire fraud. Why wasn't the very object of the scheme here the money? They really, it seems to me, here it's reversed, that the incidental byproduct of the scheme was the MBE designation and the loss of the benefit of getting an MBE contractor. That was incidental. The heart of the scheme was to get the money. We can argue the heart of the scheme was to get the painting done, and I think that's the argument. But from the point of view of the schemers, the whole point of this conspiracy was to get the money, get the contract. So why isn't that enough to prevail under wire fraud? Your Honor, the crucially important point that Your Honor is highlighting and that this part of Kelly addresses is the idea that the mail fraud statute is unitary. It's written in the disjunctive. It says schemes or artifice to defraud or for obtaining money or the obtaining and the depriving are present. And the court told us in Skilling that that is a mirror image requirement that was alluded to in Carpenter and Cleveland as well. The thing that the victim loses has to be the thing that the defendants scheme to obtain for themselves or for another. The object you're saying has to be the, it has to be a minor property object vis-a-vis some tangible object. That's what you're saying. I'm saying that not only, not a literal tangible object, Your Honor, but certainly what Skilling calls a tangible value, pecuniary value is really the hallmark of the property interest that the Supreme Court has always highlighted. But to address Your Honor's question directly, Your Honor is absolutely correct that in Kelly, that mirror image requirement failed on the obtaining, not on the depriving, because the court has already lost the value of the employee labor, no question. The portion of the opinion Your Honor just highlighted points that out. But obtaining the value of that labor was not the point of the scheme. But the important point for present purposes is that Kelly reaffirmed the idea that the thing the defendants are trying to get also has to be the thing that the victims are deprived of. And here's where that is implicated directly in the government's position. The that scheming to obtain a contract is enough. You're buying to get money, right? It's got a real intuitive appeal to it. But that was exactly the government's argument in McNally that the mail fraud statute says obtaining money or property, that's got to be enough. Because of course the defendants in McNally were scheming to obtain money. The defendants in Dauber were scheming to obtain money. And Asher, virtually every fraud, let's face it Your Honor, is a scheme to obtain so we know that obtaining money is not enough. And we know that schemes to steer the award of a contract are not in fact schemes that deprive the victim of the money that it pays out. Because if that were the case, Your Honor, McNally would have come out differently. McNally would have affirmed because those folks seem to obtain the premiums that were being paid on the insurance policy. Let me ask you, if I understand you correctly, then there's no dispute that money changed hands, correct? Correct. And a lot of money. And your position is the work was done, it was done well, correct? Correct. So the only thing that the government was deprived of was the DBE benefit, correct? Correct. And that is not a property interest that supports a mail fraud conviction. That's the end of the day for you, right? Correct, Your Honor. And of course, there are many layers underlying that, but that is the end of the day. And it's not as the government suggests some sort of a net loss theory that we're negating a proven deprivation by saying we gave value back. What we're saying is there was never a deprivation of money, because obtaining the money is not enough. And what was impaired here, the key question, when we think about the distinction that Kelly highlights, and Kelly references all the way back to McNally, which in those early 1900s cases that say Congress set up two different statutory schemes. One scheme to protect the government's sovereign interest, impair, impede, defeat a government program is one set of crimes. And that's 371. I'm sorry? That's 371 that wasn't charged. 371 predominantly, Your Honor. And then Congress has chosen in other instances, and one is the instance discussed in Nathan case, Congress has created certain statutes to protect certain programs that it deems particularly worthy of protection, hasn't done that in the context of the DBE program, it actually leaves that enforcement to the state, as Your Honors know, from the briefing. But regardless, you know, there is a there is a hundred plus year old line that the Supreme Court has consistently enforced between schemes to impair a government program and schemes to deprive the government of property. The government- To this question, since you've created this dichotomy for us, let's focus on depriving for a moment. So I'd like to talk about the markup factor, the 2.25%. So tell me, so I have a few questions on that. But tell me in the first instance, how did Marquez's markup factor into PennDOT's periodic payments to Bunkley, if at all? Not at all, Your Honor. And I will tell you what we know about that. But even, forgive me, Your Honor, that the record is relatively undeveloped on it. But here's why the record is relatively undeveloped. Because this was not charged. This was never articulated below. There was no notice of it in the indictment, never breathed the word of it to the jury. And of course, if the markup were some sort of economic harm to PennDOT, the government would have been arguing for a loss amount of $170,000. It would be arguing for a forfeiture of $170,000, because that would be the money the defendants obtained and got from PennDOT improperly. So this was never articulated below. It's brand new on appeal. But here's what we know about it, Your Honor. This was a, this was a percent to completion contract. The defendants were paid for work completed. There was no accounting for costs whatsoever in PennDOT's payments. And the only way that payments were made was they'd have these monthly progress meetings where they would talk about what work had been done, and then they would get their payments on that basis. There was testimony that the government has cited that the defendants did, quote, consider this expense when they were trying to put together their bid. Well, of course, they considered all of their expenses, and we cited for the court in the reply briefing, the testimony about that. There were guesstimates on all sides. There were multiple companies involved putting together these absolutely enormous bid packages. My client, Mr. Custis, co-defendant, Frandos, talked about how they would each do their own numbers, and then they'd sit down and kind of tussle it out to try to get their number as low as possible to be competitive, but still hit a profit. And then they would give those numbers and those estimates to Buckley, because Buckley was really the lead contractor on both of these projects. And then Buckley would take those numbers and wrestle those numbers with all of the other numbers that were involved. There's no way to say that the $170,000 was mathematically incorporated in some way or another into these $120 million contracts. Let me ask you a couple of specific follow-ups. So based on what I've reviewed and based on what you said, is the following statement true, that there's no line item to identify in any of the documents that the $170,000 was specifically accounted for? Oh, correct, Your Honor. Absolutely. Absolutely true. And here's the other important point on that. The really important question in any loss calculation, in any analysis of what the object of a scheme is, the important question is what would have happened to absence of scheme? The government seems to think that it can say now with certainty that if the defendants had not had to pay Marquez this markup, that they would have generously given this $170,000 to PennDOT, that in fact, they're having to pay out less in cost somehow would have saved money for PennDOT. Well, I thought they were arguing that the contract price would have been lower, that that's the property interest here, the financial interest, that you'd take that $170,000 off the contract price and that's where the loss happens. That's what they're saying now for the very first time on appeal, Your Honor. Every single argument below was that the defendants kept their price artificially low by not having complete DBE compliance and therefore lowering their costs. This is the first time anyone's ever suggested that the bid price was raised in any respect by the markup to Marquez. But again, Your Honors know and Your Honors have been on a number of cases involving this but-for-causation issue. The but-for-causation question is what would have happened without it? So could we conceivably say, and we cannot, that $120 million in contract bids would have been lower by $170,000 if they had not paid a markup to Marquez? That doesn't make any sense, Your Honors, because the reality is, and Your Honor, Judge McKee, you were recently on that Thorne versus Pep Boys case in November, a civil case, but Your Honors made the point that it's impossible to say given market elasticity and the incentives of any one party to maximize its profit that you can't say that the defendants would have passed that savings on to PennDOT and that the bid price would have been lower if they had not been paying the markup. Now, and the other point, of course, is the hypothetical is what would have happened in the case of a compliant bid? A compliant bid would have required them, in the government's theory, to actually be paying more to deal with a regular dealer to buy supplies. It would have cost them more than that 2.25 percent markup. So the idea that the 2.25 percent was passed on to PennDOT, it's not only new on appeal and therefore completely inappropriate as a basis for affirmance, but it really is belied by the record when you have the testimony of multiple individuals, including both defendants, explaining the, quote, guesstimate type process by which they put together these lump sum bids that were then later paid on percent to completion. And there's no evidence in the record that the 170 came out of the PennDOT bid money anyway. Is that right? Exactly. That's true, Your Honor. And that's another really important point here. There was no money earmarked for any purpose here. In fact, because the defendants only got paid for work that was completed, by hypothesis, they had to buy their supplies out of funds that they had on hand, or they couldn't do the work. So there was no allocation of funds. This wasn't a set-aside. It wasn't a cost-plus sort of contract where anyone could say that there was money that was allocated in any way for a DBE. In fact, it's part of the problem with the district court's jury instruction that it suggests that there was money allocated for a particular purpose. That's entirely belied by the record, as well as by the government's prosecution. In fact, I assume that if there had been an MBE present, that money would have been part of the bid anyhow, since that was the way it was put together and put forward to the contract. Had there really been a minority business there, I would assume the dollars would have been included in the contract. Of course, Your Honor. I mean, they had to estimate everything. And what they estimated here, now remember, this was really, this was one of the six DBEs that they promised to use on the contract. This is a regulatory scheme where a shortfall with one DBE is perfectly permissible for a contractor to just go ahead and make it up with another. And remember as well, PennDOT's economic terms are fixed when they accept the low bid. They had never heard of Marquise or had any specifics whatsoever about how the defendants planned to meet these DBE participation goals. Their cost was fixed when they chose the low bid. And that was their property interest, Your Honor. That was protecting their role as a property holder. The next step in the targeted is PennDOT's exercise of its sovereign interest, allocating resources, as the Supreme Court said in the Adirondack decision, allocating resources in the public interest to pursue this vitally important societal goal. The DBE participation goal is vital and it's important and it's valuable. But as this Court has long recognized, not every valuable condition of a this one is particularly, it's particularly problematic to call this interest a property interest because this is exactly what Kelly reiterated when it said, a sovereign exercising its rights of allocation, exclusion, and control, its prerogatives to decide who gets a benefit and who does not. When PennDOT was implementing those DBE regulations and requiring the defendants to tell it how it was going to meet that aspirational goal of participation, it was implementing regulations. And the regulations were governing every decision it was making, and it was making all of those decisions as a sovereign. It was not making those decisions as a property holder. Let me ask you a question that is involved with the focus of what your district, Davis. The part of Davis I want to talk about is, it's, you know, there are evidentiary problems with the 170. There's also, it's a de minimis amount when you have 120 plus million dollar contract. What I gathered from Davis is that there is a number out there, just put aside the evidentiary issues that you say preclude us from considering this, but there is a number out there that would be sufficient that it wouldn't be ridiculous to think that there must have been some consideration in including a markup. I don't know what that number is, but is that what you gleaned from Davis? Because as I was thinking about the 170, it just seemed, besides the evidentiary problems, the number just seemed so de minimis given the size of the contract that it didn't make sense to say that that was the property interest. Your Honor, I would not stake out some sort of a de minimis exception. I don't think that this case actually raises a question of de minimis exception, but I will say this, and I think might get to the point that Your Honor is referring to. There is absolutely nothing in the record that permits an inference that the anticipation of paying $170,000 in a markup to one of the six DBEs on each of these enormous contracts had some mathematical impact on the number. I'm not making a legal argument about what number is big enough to matter, but I am saying that that inference is completely unavailable. And Mr. Shapiro had both defendants on the stand talking about this very process by which they massaged those numbers and put together a bid package that they thought would hit the right balance between making a profit and avoiding being underbid. That would be a question for the jury, and the jury would have to be charged on that and have to reach a verdict on that. And that is what, you know, in addition to this evidentiary issue, there's a serious constitutional problem here, Your Honors. I really can't overstate it because this $170,000 popped up for the first time on appeal, and it is the opposite of everything that the government argued below. And again, we know that because if they were really relying on the $170,000, they would have argued for a $170,000 loss, and they would have argued for a $170,000 forfeiture because that would be the extra money that the defendants got as a result of the offense. That's never been their position. So just green away, I think that portion of Davis, the portion of Davis that I think is important on this point is Davis says that on a percent to completion contract where there is, or what is we say not a cost plus contract, there is no relationship between the contractor having an extra expense and that getting passed on to the victim agency because the victim agency is paid for work done. And whatever those bid packages were, they were flat fees that were locked in at the very beginning. And if PennDOT had found out, for example, that Marqueas was not acting as a regular dealer, that it was acting arguably as a broker or perhaps as a near pass-through, what would have happened is they would have said to the Buckley Ventures, you got to make up your DBE participation. And everyone agreed at trial they could have done it any other way. If they had been unable to find a regular dealer DBE to sell them the supplies, they could have done something else, ups the participation level of one of the five other DBEs because the only thing that they were ever required to do, your honors, was to make a good faith effort to meet these participation goals. And that applies at the beginning of the process too, because had there been no fraud, had they said to PennDOT, we think we're going to fall short here because we haven't been able to find a regular dealer DBE for PennDOT to excuse that. And there is an enormous regulatory process with, you know, dozens of pages of the Appendix A and the administrative reconsideration and everything else that would have gone into the question of whether PennDOT would excuse that slight shortfall in participation. So when PennDOT lets the contract, rewards the contract, they don't necessarily even who the, I keep saying MBE, who the MBE is, it's just, in fact, it's got to be there to get the contract, but they don't care who it is. They literally do not know, your honor. The defendants make a representation, yes, you know, we believe that we can comply with all terms and conditions of this contract. And then PennDOT picks the low bidder. So again, when we talk about schemes that impair the government's interest that it holds as a property holder versus schemes that impair interest the government holds as a sovereign, this is a great illustration because PennDOT is making its contracting decision. You know, it owns a bridge. It wants to work on the bridge. It's a property holder. It picks the low bidder. That's a property-driven decision, traditionally recognized form of property, its economic interest in that real estate and what it's going to spend to get it repaired. But the next step in the process, the defendants, any contractor that is identified as, quote, the apparent low bidder is the terminology, then has to put together, they have this huge scramble where they put together this enormous package telling PennDOT how they're going to meet all of the requirements, not just the DBE, but the specifications and technical stuff. And I mean, your honors have, in digital form, because you would have not been happy with me if we printed it out, you know, these thousands and thousands and thousands of pages of contracts. And they have terms and conditions ranging from, you know, don't commit a crime to, as your honors know from the briefing, literally don't park on the grass. And the government's telling this court that anything written into a contract becomes a property interest of the government. And they're saying that because contract rights are property rights, they say. But we know, and this court knows from civil contract law, again, thinking of Thorn versus Pep Boys, where the plaintiff said, hey, I bought tires from Pep Boys, and they were supposed to register them under this regulatory regime. And the court said, well, come on, you know, they might have, you know, they might have saved some money by not registering the tires, but you plaintiffs weren't injured in any economic expectation from the fact that you bought them. I know Thorn, in terms of what was said there, helps you, but that is the prototypical case of attorneys fees driving litigation. That's exactly right, your honor. And, you know, so consider the ripple effect. If the court says, yes, every contract, every contractual expectation is property. So that plaintiff in Thorn thought she had a contractual expectation to have Pep Boys go register her tires for her. And the court said, you know what, you don't have Article 3 standing here. And significantly here, the court's analysis was the benefit of the bargain for that plaintiff was the economic benefit. She got the tires she paid for. She had no economic, I'm sorry? No, no, no. I'm dying to hear the end of the Pep Boys story, but I feel like I should move on to the topic. Let's talk about prejudicial spillover for a moment. Yeah, I want to hear that too. Okay, so for a moment, I'm sure Mr. Shapiro wants to get off of mute based on this assumption, but let's assume for a moment that you were successful on your plea to us with regard to what I'll call the McNally-Kelly issue for the moment. The government's position is that when we look at these false statements, that's rather straightforward. You can have that evidence and the notion of spillover is overstated. Tell me how we should think about the wire fraud on the one hand and the false statements on the other and why in your view there's spillover when at least the government's position is that evidence is easily cabined and there was no such effect. And in answering that, if I could, I do want to hear the answer to that question. Could I add to that the examples of the statements you have in your brief as to the government arguing strictly to non-profit interests like about greed and all those things? Simply all of that would have come in just under the false statement, all of it, about what the government said about the greed, the misrepresentation, the contract, the question and argument. All of that could have come in just to argue false statements. Not at all, Your Honor. And in fact, the government really, its only response on the inflammatory language is to say, well, this was really a rather dry financial fraud, which obviously they aren't telling the court that, sure, all that inflammatory stuff would come in anyway. They're simply denying that any of the inflammatory stuff ever came in at all. I'm going to beg your pardon and interrupt because I'm not sure that that's what Judge McKee's focused on. On pages 73 and 74 of your, I think it's your initial brief, you identify three or four areas that would clearly be evidence that wouldn't, in your view, would be clearly evidence that wouldn't come in. I thought what Judge McKee was focused on is when you look at those identified areas, many of them seem as though in a strictly false statements prosecution, they would come in as background. Certainly the first two. I know it was a long time ago for me, but I think back on my DJ days, worried about the third circuit, you know, you let it go in and you deal with it. So tell me, I think the judge and I would both like the answer to that. Tell me, number one, why it wouldn't come in and number two, why it has the effect that you assert that it does. Thank you. So your honors well know that, and let's go back to the DJ days, that the 18-day multimillion-dollar fraud trial is very different from a trial that focuses on discrete false statements. The false statements that were charged spanned a few months on one of the contracts and a single false statement actually in 2017, long after the end of the trial on the other. And there are certainly on the very first prong of spillover, the government argues it as though it is just relevant. But this court has made clear repeatedly, and the Wright case is an excellent example of it, that relevance is not the standard. That because this court respects the discretion of the district court to control its courtroom and the orderly presentation of evidence and to maintain fairness, that this court will recognize that a district court may choose to exclude some relevant evidence because it is, for example, more prejudicial than probative, because it's cumulative, simply because the quantum of evidence is unnecessary in a really focused trial. So in a retrial that was limited to discrete false statements, this court simply cannot decide on appeal that the trial judge would necessarily let in all of this evidence related to supposedly a multimillion-dollar fraud on the government. So you're saying it may have been relevant, but the district court judge had to do a full balancing? Yes, but the district court judge would do balancing. The district court judge would also be facing, of course, a 404B issue because then we'd be looking at conduct that was not before the jury. This would be uncharged other wrongs if it were going to trial. Why wouldn't it be part of the very conduct of this charge? Why wouldn't that be the very conduct? In fact, what's charged is not really 404B other crimes. That is the scheme that is being charged, only the jury is saying, look at this, not under wire fraud, that's gone, but look at this under just false statements. What were the false statements? And all those statements come in. Because here are the elements, Your Honor, that are going to be different simply in a false statement case. There's no more conspiracy, which means that all of the evidence on illegal agreement or any communications among the defendants is no longer relevant. There's no intent to harm PennDOT. There's no intent to defraud. There's no intent to obtain money or property. That could all be compartmentalized and we have cases that say that on appeal we can do the 403 balancing ourselves. All those things can be compartmentalized. Not in the spillover context, Your Honor. In the spillover context, what the court recognizes is that the possibility that the district court would curtail the evidence at least somewhat is going to require recognizing that that evidence then is spillover. What's your best case for that? Well, Wright is really the key case on that, Your Honor, and it's really controlling in this circuit because Wright shows. Wright was a case where, not unlike this one, the honest services fraud counts were knocked out on appeal and there was a retrial on one super narrow mail fraud count related to the conduct. Now, bear in mind in Wright, similar here, the charges were intertwined because what happened in Wright was the mail fraud theory was they let the public official live in an apartment for free, which was charged as a bribe, but was also charged as a property fraud against the landlord. Now, a retrial on that property fraud, sure, could the government say? The government certainly did say. Well, the jury would need the background and the context as to why he was allowed to stay in that apartment. Absolutely, but this court recognized that a district court in the sound control of its courtroom and maintaining the fairness of the trial would not allow the same quantum of evidence to come in. And the fact of differing elements as well, no conspiracy, no intent to defraud, no intent to make money, all of that would mean as well that the defense strategy would differ significantly at a retrial limited to the false statement count. And as I noted in my brief, just one example of that is that the defense might focus on materiality, for example, more than it otherwise could in the context of a large fraud case. And of course, all of the inflammatory language that I misunderstood Judgment Key to be asking about, the government says, oh, no, no, you know, you're not going to hear, you never heard any of that. This is a real dry case. You know, that's factor number four on this government's, the second step of the of the court's spillover test is whether there was language of the sort to inflame a jury on the counts that had been thrown out. And there was plenty of language of the sort to inflame a jury. So the spillover question, the government has conceded that the theories are intertwined, that the evidence would overlap, but that does not mean that. Yeah, I can see that for the purpose of the evidence is in it, it's overlapping evidence, but I didn't get the feeling that they were conceding that if the mail fraud fell, that the judges were so intertwined that would take with it the false statement charge. Your Honor, what they conceded was the four factors, and I should just lay out the test here. So first, the court asks, would all of the same evidence be admissible at a retrial? And that first step is where the court says, not just is the evidence relevant, but would the same quantum of evidence come in given the district court's discretion? And the court said then, right, that this is not a decision the court will make on appeal, but this is something that the court will recognize would be in the discretion of a district judge. Then getting past that to the second step of the process, the court considers four factors. Are the charges so intertwined? Was the evidence sufficiently distinct? Would there be a change in trial strategy? And did the government use language of the sort to avow the jury? The government really doesn't contest here that the charges are intertwined and really doesn't contest that the evidence was not distinct. I mean, in fact, the false statements were charged as part of the fraud scheme. They don't even acknowledge the fact that we're talking about different mental states, radically different mental states. We're talking about knowledge of falsity versus intent to defraud in a case that the government told the jury was all about lies and greed and $120 million. But it's the same. The knowledge of the falsity is the intent to defraud. It's the same thing. Not at all. Not at all, Your Honor. The statements that are charged as false statements are that Marquess was acting as a regular dealer. So if Marquess didn't have a warehouse, it was not a regular dealer. But why is that the intent to defraud? It's not intent to defraud, Your Honor. That would just be the false statement case that they falsely represented that Marquess was a regular dealer. And so if the government- Why did they make the false statement? They made the false statement because they intended to defraud, and the false statement was the vehicle by which they were defrauding. Exactly, Your Honor. That's why they're intertwined. And that's why they- Okay, all right. Back to the beginning. That's exactly right, Your Honor. Don't pass go. So a district judge- I mean, Your Honors know how this would work in the sound exercise of discretion by the DJ. The court would be there saying, okay, government, you can do a little bit of background. You can explain to the jury the context in which these statements were made. But the court's not going to allow the government to go into the conspiracy and the intent to defraud and the millions of dollars that they're supposedly stealing from the government. So the spillover analysis would require reversal there. With the court's permission, I'd actually like to go back to the point that Judge McKee started with, because I think it's crucially important to make sure that I communicate why it is that, I'd say, scheming to get a contract is not scheming to steal the money. And this does go back to the idea that the court's not writing on a blank slate here. That's McNally, and it's Asher, and it's Zauber. McNally was a kickback case, right? There was no money exchange. The government didn't pay anybody any money. And here, there's an awful lot of money exchange. Is that a distinction with a difference? No, Your Honor. The government paid the premiums, and then some of the premiums were funneled to different agencies. So the way that the Supreme Court analyzed it at the end of the day was, would the Commonwealth have paid more for insurance, or would it have gotten better insurance in the absence of the scheme? So Your Honor's right, there was a little bit of, there were a couple of layers there in the flow of funds. But the reality is that the analysis in McNally was highlighting this difference between, it was really going back to the fundamental question of, what's the interest that this scheme is impairing? Is the interest impairing a traditionally recognized property interest? That's an economic interest. The Supreme Court's told us over and over again. Or is the interest impaired an intangible interest? Now there, it was an intangible interest that was known as honest services. But the particulars of the scheme and the type of intangible interest, they really are a distinction without a difference here, Your Honor, because we're focused on the property question. And all of these cases tell us that schemes that change, schemes that steer a contract to someone who would not have gotten it honestly, are not depriving the victim of the money that it pays out on the contract. What they're depriving the victim of is its right to, and this is how the jury was instructed in McNally, its right to accurate information on which to make business decisions. And then McNally tells us, I'm just trying to, I'm finding the exact quote. The McNally jury was instructed on a right to be made aware of all relevant facts. So too in the Zauber case from the circuit, the jury was instructed on a right to conduct business free of false, fictitious, or fraudulent information. Both of those cases and many, many others say that when the fraud targets the decision-making process, but does not target the economic benefit round of the contract, it's not a property fraud. And again, the framework is what interests are being impaired here? If the interest that's being impaired is the right to accurate information, or what else does the government say? The right to a fair bidding process, that's also in some of the bid rigging cases. Government also talks about the worthy purpose of the DBE program. Well, that's what the Supreme Court has always called the sovereign interest in administering itself on behalf of the public. All of those various intangible interests might connect to a spending decision, but the money is not the thing that the victim's losing in that situation. If it were the thing that the victim was losing, McNally would have come out differently, Zauber would have come out differently, and the court would have been wasting its time in Titlow, and Osler, and Asher, and all of those cases when it went looking for economic harm. David, that's my concern with my very first, the way I started this, because here, unlike in so many of these cases, particularly unlike Kelly, the object was the money. But for these fat dollars, this representation would never have been made. The whole object here was the money. Sure. That's always the object, Your Honor. Sometimes the object is the license, sometimes it's a commission, sometimes it's a mess of traffic patterns. This is different. It is different, but it's not different in a way that affects the core question before the court, and that is, what did the victim lose? Your Honor pointed out, Judge McKee, at the beginning of the argument, that in Kelly, the question was really focused on that obtaining. There was no scheme to obtain, even though the victim lost the money. Here, we know there was a scheme to obtain money. In fact, the Zauber case acknowledged, yes, the objective there was to try to obtain money from the victim. But the court said, the record doesn't show a better deal was available. Therefore, the victim didn't lose the money it paid out. Spending is not the same. If we agree with your dichotomy of obtaining and deprivation, your point is, court, if you will, focus on deprivation. This case would be different, presumably, you would argue, if there was a difference in what the bid price ultimately was and what the bid price could have been. For instance, if there were a premium paid for this particular 6-DBE project of, say, $30 million, then you would argue that the deprivation part of the dichotomy is satisfied. But in the absence of that, or something like that, the deprivation isn't satisfied, and therefore, you just don't meet what McNally, Kelly, Cleveland, et al., require now with regard to property. Is that? Yes, Your Honor. That's exactly right. I wouldn't say dichotomy so much as I would say the unity and what Skilling calls the mirror image. Skilling says the mirror image is what is the hallmark of property fraud, that the thing the victim's deprived of is the thing that the defendant schemes to obtain. And Skilling actually says, referring back to McNally, that when we're talking about procurement fraud, a scheme to get a contract, that if the economic terms of the is it control over its decision-making process, its right to accurate information, here, it's losing its sovereign interest in the DBE program. But it's not losing the money if, at the end of the day, as McNally says, it would have paid out the same amount or more, and it got back goods of the same quality. It got back the work that it was expecting to get. And the court said in Asher that if rights are involved whose violation would lead to no economic harm, then the scheme is really targeting rights that are not property rights. The scheme is targeting rights that are intangible rights. And again, all of these contracting cases reflect that same principle or else there'd be absolutely no need for the court to go looking for economic harm. Schemes that steer the decision-making process, and Your Honor, the court alluded to this, Judge Greenaway, and heard as well. If there's a scheme to steer the decision-making process of a sovereign, then that's not a property fraud scheme. But if it's a scheme to take the sovereign's property, you know, fleece was the word that Congress used when it enacted the property fraud statutes to fleece the victim. If it's a scheme to fleece the victim, then it's a property fraud scheme. But steering the spending decision is not fleecing. And that's why McNally talked about it. Well, I think Mr. Sapir's going to argue that the government did get fleeced here, that they paid for an MBE contract too. They didn't get it, paid a lot of money, and they got fleeced. And that's exactly what the Tulio court said, Your Honor, is that they didn't get what they paid for. So let's unpack that a bit because that gets to the concept of benefit of the bargain. Did PennDOT get what it paid for? And the important point here, again, with this reference to let's look at the property interest versus the other interest that might be involved here. When the Tulio court defined the services to include regulatory compliance, what it did was collapse that 100-plus-year-old distinction that the Supreme Court's been talking about since Haas versus Hankel. Congress enacted one set of statutes to protect those government programs, and it enacted a different set of statutes to protect the property interest against being, quote, fleeced. And if the court defines the services that are promised to combine those two things, then the court has erased that 100-plus-year-old distinction. And here's how that plays out. It's particularly problematic here, given that we are talking about sovereign interest. We're not only talking about a sovereign interest, but we're talking about a program that Congress has chosen not to protect with criminal statutes that are specific to it. We're talking about a program that Congress has deliberately left to the state to implement and enforce. There's enormous federalism and over-criminalization problem there with saying, let's just collapse this distinction with respect to this program. To honor the distinction that Congress has repeatedly maintained and the Supreme Court keeps enforcing between the sovereign interest and the property interest, the court cannot define the services to be both, because that then means, for example, that the Commonwealth of Kentucky in the case of the Nathan case, where Judge Becker said that the scheme to avoid the Buy America Act regulations and statute, even though it was written into a contract, was not a scheme to deprive the government of the revenue it paid on the contract. That was a scheme to evade the regulations. That's the school bus driver case, the Eighth Circuit, I think. Yeah, that's Grandberry, Your Honor. Is that wrongly decided? Yes, it was, Your Honor. You don't have to take my word for it, Your Honor. It's squarely contradicted by Zauber. It couldn't be more clearly contradicted by Zauber in two different ways. One, of course, is that it accepts this idea that when the school district wanted felon-free bus driving and got the same bus driving from a felon, it says, okay, that was actually, it didn't get the bus driving that it paid for. Zauber says precisely the opposite, that that pension fund wanted felon-free services, and it got services from a felon, but Zauber literally says, quote, the record does not show a better deal was available. And Zauber says, yes, obviously, those defendants were trying to obtain money from the victim. That's the point to fraud schemes. But because the victim didn't pass up a better deal, and it got the services it paid for, there was no property fraud. Maybe there was a different kind of fraud. I mean, this would have been an easy fix, Your Honor. The government in Nagle charged the 371 impair-impede-defeat theory. They chose not to charge that here. So please don't think that I'm saying Congress has left the DBE program hanging out there with nothing to protect it. I'm not. I'm saying there is a hundred-plus-year-old statute and case law saying this is really easy, protect the government's sovereign interests with 371, but don't try to shoehorn it into a property fraud. So to Your Honor's question, Judge McKee, about whether PennDOT got what it paid for, the problem with defining the services to include the regulatory interest is that it then erases this line of case law that distinguishes them and erases the line of case law that distinguishes any intangible rights, like honest services fraud, from the property that the defendant is trying to obtain. And that's why, in fact, Nagle rejected TULIO. TULIO wasn't precedential. I don't want to say that. Really, well, I know. I'm hoping one day we can use TULIO as a prime example of how to write a non-presidential opinion. Because it is non-presidential, meaning it's not presidential. Right, exactly. But it's written with so much detail that it finds its way into presidential argument, which is... It does, Your Honor. And I should say, and actually, Judge Rochefort, I realized as well, there's one other point I wanted to make about Granberry, the school bus driver case, and it's the same problem with TULIO. Both of them say that, remember this whole idea of the thing that the defendants want to obtain and the thing that the victim is going to be deprived of has to be the same thing, that mirror image that's articulated. Both of those cases say, pre-scaling, that the defendant need not obtain the thing the victim was deprived of. So they speak in terms of the victim's contract rights. Well, the defendant can't obtain somebody else's contract rights, but TULIO says that doesn't matter because obtaining is not required. Granberry, same thing. And this is underlying some of these right to control cases, including this court's Hadaipi case. They say you don't have to be obtaining the thing the victim's losing. And that's why they can say contractual rights, for example, might be property rights, even if they deal with these intangibles. So that's another way that Granberry and TULIO have been completely undermined is by Skilling and Kelly reemphasizing that the obtaining and the depriving have to be mirror image. Ms. Patterson, we could probably go on the rest of the day with this. You have five minutes for rebuttal. And I hate to cut you off, but a very, very fine and skillful argument. I'm not sure that you're right, but you make some very, very fine points. I know Mr. Shaparro actually has been responding to his body language. I've noticed his body language, Your Honor. I'll try to keep still. Well, we won't knock that off of your time, Mr. Shaparro. When you do come back, I'm going to ask you to maybe start with the loss issue and why we're not bound by NAGLE if we do get the loss. Yeah. And the forfeiture I'd like to discuss too and where that came from. That's great. And actually, NAGLE will tie into the point I was just making as well on the nature of the services. So I'm happy. Thanks. We may be here through dinner time, but it's all yours. Thank you. Thank you, Your Honor. I am sorry for the nonverbal communication. I had a colleague once. Did you ever argue in front of Judge Slobider? Yes. Yes, I believe I did. She would go ballistic when lawyers did that. It's a little different. You got a lot of stuff. Mr. Shaparro, can you start with where we started? Is there a deprivation requirement to support this conviction or not, this statute? No, there is no requirement that there be both an obtaining and a depriving, although in this case there is. And I think that the person who is obscuring 100 years of case law is actually Ms. Mathewson. If you go back to what the mail and wire fraud statutes are about, it is a scheme to obtain from the victim money or property by means of false or fraudulent pretenses, representations, or promises. And from the jump, the idea was that the defendant would tell the victim a lie and by means of that lie, obtain something of value, be it money or be it property. Ms. Matthewson's point is the thing that they wanted to obtain, they got. And that is a quality job, actually, with the painting and the bridge work. You're saying that the DBE was a material part of what they were bargaining for? It clearly was a material part of what they were bargaining for. And that theory, this is not a steering case. It's really more of a forced sale case. This is a case where the defendant says to the buyer, I am prepared to give you exactly what you want in return for your money. And the defendant is lying. The defendant is not prepared to give what the victim wants. The defendant is prepared to give something that is worth less. But if what the person got, if what they did not get is not a tangible property interest, how does that help you? Because this court answered that exactly in Al-Hadithi. That is confusing. That is what this court said. It's confusing means and ends. The means, right, the ends are the government's property. The government is using that property to achieve a non-property related means. So in Granberry, for example, what the government wanted was not simply a bus driver, but as the court said, a truthful bus driver who was not a criminal. How are we supposed to measure what you're asking us to measure, right? What you just said is what the government got is, quote, worth less. So as we think about this, you know, we'll get into how this notion can survive the McNally line of cases, Zauber, et cetera. But just on this point, tell us how it is worth less. Okay. So it was overwhelmingly established in the trial record that the same construction project without a DBE is far less expensive than that same construction project with a DBE. So let me give you an analogy. If somebody offers to sell me a genuine Rolex watch, and I buy it under the representation that it's a genuine Rolex watch, I have been defrauded out of money and property, regardless of the price that I pay for the watch, and regardless of the value of the imposter watch. Indeed, if you imagine that the watch keeps just as good a time. But that's hypothetical, Mr. Shapiro. Hypothetical should be, I got a Rolex, and there are, and I could have gotten a better Rolex, but both of them are Rolex. Ms. Matheson would say that you got the bridge that you wanted. It has all of the qualities you want. This is not a, you know, I gave you a jive corner watch that tells time, and I'm giving you a Rolex, right? I mean, that's not a good analogy. Well, let me explain, Judge, because here, what was important, right, in my Rolex example, the buyer want, even if you assume that the watch they got tells time just as well, and is made with the identical components that Rolex sources. So the watch itself is functionally the same, but what the buyer wants is a watch that is actually a Rolex, not an imposter watch. And here, what PennDOT wanted was a bridge that was actually repaired using the services of a genuine, legitimate DBE. And that's not what it got. It got the bridge, it got the repairs, but it was not with a genuine DBE. And the fact of it is, the trial record establishes that to produce that service without the genuine DBE is much cheaper than it is with the genuine DBE. But the next lowest bid, which I'm assuming would have had a real DBE, was significantly higher than the bid that Ms. Matheson's client submitted. And that's exactly the same case with the Rolex watch. Imagine that the fake Rolex watch is priced substantially lower than the genuine Rolex watch. What the buyer, right, the buyer could be but the buyer is deceived into believing he's buying a genuine Rolex at the price of a knockoff. Mr. Shapiro, your analogy doesn't work unless you're not getting... The Rolex thing doesn't work unless you're saying that the DBE bridge would have been substantially, incrementally, and somehow better, different than the non-DBE bridge. I don't know. Let's put aside the Rolex. Tell me how the bridge that is non-DBE is substantively different than the bridge which would have been DBE. And I don't see that there's a distinction to be drawn. Help me. No, I judge. There's no... On this trial record, the assumption is that the bridge was functionally the same. But what mattered to PennDOT was not just the product, but who produced it. In the same with the bus driver. Ms. Matheson is going to say, I'm sorry, yeah, that was the interest that PennDOT was very concerned about. And that is not a tangible interest under the statute. I agree. But that isn't what you meant. You don't measure the difference between what it asked for and what it got. You say, was it deprived of its money based on a material false representation? Well, that's none of it. You're right. But then we go to the other part of our argument, which we didn't spend much time on, which is where is the line to be drawn? What is the limiting principle? Because that would seem, if it is as you have just stated, then I don't see where any line would be drawn. Every fraud imaginable would come within the ambit of mail and wire fraud. And that can't be so. And it isn't so. No, not for one thing. It has to be a fraud that, in fact, induces the buyer to enter or the seller, depending on which side of the transaction. What fraud doesn't do that, baby? Come on now. But there are frauds that do not, if it's not material. If it's not material, it's not a fraud. If it's not material, well, it can be a fraudulent representation, but it can be not material. Not actually. So, for example, if you have a fraud where the buyer would have entered the transaction, or a reason, and in fact, it's really, it's an objective standard. So the question isn't whether an idiosyncratic buyer, but the question is whether a reasonable buyer would have entered the transaction in the absence of the fraud, then it's excluded. But if the reasonable buyer would not have entered the transaction in the absence of the fraud, that's exactly what the wire, and assuming that the other elements are satisfied, so there's a wiring, an interstate wiring, then that's exactly what the wire fraud statute is about. So the example of the electronic waste case, which the victims were both governmental and non-governmental, in fact, and the defendant says, in order to induce the victims to pay to have their electronic waste hauled away, I'm going to dispose of this stuff in an environmentally friendly way, and I guarantee you it will not be shipped overseas. Those were lies. As a result of those lies, the victims paid money to have their electronic waste removed. The defendant said what Kasissa says here, which is, look, all you cared about was getting your electronic waste hauled away. You paid the price for that, you got the service that you wanted, and the court says, no, what they wanted, the reason they chose you was because you promised you would do it in an environmentally friendly way. That was material. Please finish, I'm sorry. That was material, and it was a substantial benefit of the bargain of the buyer, and in this case, there's no question from the trial record that this condition was material to PennDOT and was a substantial benefit of its bargain. Indeed, there was trial evidence that in a different case, Buckley had forthrightly told PennDOT, had been the low bidder, said to PennDOT, look, at this bid price, we cannot possibly do a DBE, so our good faith effort is it can't be done, and PennDOT said, we don't care about that. Your bid is noncompliant. It resubmitted at a much higher price, was still the lowest bidder, but at a much higher price, and PennDOT engaged them at the higher price, because to PennDOT, having the minority contractor do a portion of the work was important, and in this case, it paid out its money under a material false representation. All right, so I get it. The DBE is important, but help us now through the precedent that we have to navigate in order to make this make sense from your standpoint, right? So as I look at McNally, Cleveland, Skilling, Kelly, they seem to make clear that the statute mandates either some pecuniary harm or damage to an economic interest to support a wire fraud. Now, that's my reading too, the harm. So I don't know how we're supposed to navigate all these to get to your point that it's materially important for us to have a DBE when we've got to deal with all of these where, you know, there's one case to distinguish. I could get that, but help us through what I perceive to be a litany of cases that would stand in the way of the argument you're making. I think none of them stand in the way. Pasquitino, for example, says money is property. Don't go to Pasquitino. Go to the Supreme Court case I just told you. All right. So let's look at McNally. And McNally didn't say that fraudulently inducing somebody to pay over money doesn't fall within the wire fraud statutes. What it said was it was never charged in this case. It was never charged in this case. And although the government now relies in part on the assertion that petitioners obtained property by means of false representations, there was nothing in the jury charge that required such a finding. And earlier, it was not charged. That's exactly Ms. Matthewson's argument here, I think. There was nothing in the jury charge that required a finding of a property interest. Oh, yes. No, there was. Because they were charged. They were charged in accordance with your property. And what I'm saying is the money right here, there was both money and property. The money was the contract amount. And so let me finish my point, please, on McNally. McNally was an intangible, was tried on an intangible rights theory. And they didn't try it on the money and property theory. And the court said it didn't say this case could not have fallen within the wire fraud statute. It said as it was tried, it did not, in fact, fall within the wire fraud statute. We didn't, this case was not tried on an intangible rights theory. The same is true of all of the Postman McNally cases, Zauber, Zauber, et cetera. None of those cases were like Leahy or the electronic waste case, or Granberry, or any of those kinds of cases. What's your actual loss of money or property? What is your actual loss of money or property? Because the quote that I'm focusing on from McNally is page 361, note nine, that says that a deprivation of control over how money is spent, how money is spent, I want it spent on a DBE enterprise, not a non-DBE enterprise, can constitute an actual loss of property, is too amorphous to constitute a violation of the mail fraud statute. And obviously, for our purposes, mail fraud and wire fraud are the same. So tell me what's the actual loss here. You're telling me the loss is we didn't get to use our DBE, which is what we wanted, that's material to us. The loss is the money that was fraudulently induced to be paid under a contract that these defendants never would have gotten had they been truthful. So the loss is $120 million? The loss for the purposes of property is $120 million. The loss amount for guideline sentencing purposes is a different number, but the question is, what is the property interest? PennDOT has a property interest in its $120 million. It's deprived of that property interest when it is induced to pay it over under false representations, which are material and which involve interstate wires. So here, PennDOT has a fund of $120 million, and it's really the federal government's money, most of it, which it's holding for a particular purpose. It is induced to part with that property money by false and fraudulent representations and promises. And as a result, it's deprived of that money. It's that straightforward. It's exactly what the court said in Granberry and Leahy and the electronic waste case and all of the DBE cases, with the exception of that one district court case from the Southern District of New York. But circuit after circuit after circuit. And indeed, if you look at the Nagel case, they didn't say that the loss was zero. In that case, the work was as satisfactorily performed as it is here. This court said there is an economic loss, and it's an economic loss that the district court shall measure. So although the precise question that we're confronted with here was not presented in Nagel, had there been no loss, there would have been no Nagel. Had there been no property interest, there would have been no Nagel because there would have been a zero loss. So does that mean that in any instance where there is a fraudulent inducement or material misrepresentation about who is participating, that the loss is the entirety of the contract? Even if the contract is accepted without knowing who is participating? Okay. And Judge McKee, let me correct that, which is the contract is not process. So the presumptive low bidder is selected. PennDOT then says, how are you going to fulfill the contract requirements? And if the answer is not satisfactory, the bid is rejected. So by the time PennDOT actually accepts and signs the contract, it knows that the DBE requirements will be satisfied. Does it know who the DBE is? It does. It does. The trial evidence is absolutely clear on that, that they had to submit Marqueas to PennDOT. And indeed, in the prior case, when Buckley said to PennDOT, we're not going to do a DBE, they lost their status as presumptive low bidder and the whole contract was thrown out. But just to make sure that I'm clear, because you haven't answered my question yet. All right. I got sidetracked. So let me answer your question. So that turns on materiality. If the identity of the person doing the work is material to a reasonable buyer, and assuming all the other federal jurisdictional elements are met, then yes. If a fraudulent inducement relating to the identity or credentials or status of the buyer, of the service provider, is material, is part of the essential benefit of the bargain, then yes. And if it's not, then the answer is no. Actually, Ms. Matthews is going to say, assume, yeah, if it's material, that gets you a 371 conviction, doesn't get you wire fraud, unless that which makes it material is also a tangible property interest. And the law is exactly to the contrary. It doesn't require that your motive for being induced be itself a property interest. The statute speaks to whether the defendant has obtained money or property. And if the false representation is about a desire that is important to the buyer, a material condition that is important to the buyer, the nature of that appeal to the buyer's desires is not relevant. The statute doesn't speak to the intent of the buyer. It speaks to what it is the defendant obtained. Has the defendant obtained money or property? So in the case of intangible rights theory, the thing that was obtained was the honest services of the employee. The Supreme Court says, no, that isn't property. But here we're not talking about honest services. The question is, what was obtained? What was obtained from Hendob was all the money. Now, the lost question is a different question. But the thing that was obtained was money and property. Because as Granberry says, if you own something, you have a right to decide how to dispose of it. That is a property right. So that means every charged fraud would meet the statute as long as the materiality element was met. Because if I'm understanding you correctly, any fraud that otherwise met the jurisdictional requirements, but any fraud, as long as there was a material reason to have a particular participant, whatever, that would satisfy wire fraud. And the distinctions that your adversaries reading into McNally et al do not impede the ability of the government in those instances to charge wire fraud. Is that right? That is absolutely correct. And to see why, it's not just the government, of course, that has an interest in DBE type programs or... Well, the government is going to charge wire fraud. Everybody else wants to charge something else, right? Well, no, but my point is that if you look at the electronic waste case, it was both government victim and non-government victim. They had an interest that the defendant said, oh, it's just an ethereal interest in environmental compliance. But the court said, well, no, you're right. That was the interest, but it was an interest that led these buyers to select you as a seller of services. And you promised them that you would do it this way. And you knew that you wouldn't. And that's a fraud. And by that fraud, you obtained their money. This is from footnote two, again, in Kelly. It's right after the court talks about the Easter book hypothetical. It's the last sentence. And the court says, the victim's loss must be an objective of the, in brackets, deceitful, close brackets, scheme rather than a by-product. This is almost like a Warshak test, because you could argue this, and you are arguing it, either way in terms of the victim's loss. Ms. Matheson is saying, well, there is no loss. You got a good paint job, a good construction job. And you're saying, no, wait a minute, wait a minute. Obviously, that was not all that was contracted for, as evidenced by the fact that the first bids were thrown out, was resubmitted because the MBE was not satisfied. And therefore, that's the loss. And that objective, as I said in my earlier discussion, the objective, the loss must be an objective. Well, the defense didn't give a darn who was the, their objective was not necessarily a DMB. They could care less about an MBE, obviously. Their objective was the bucks, the pile of money that they got from the government. Very difficult case. Judge, but that's exactly the teaching of Kelly, which is, in this case, the defendants didn't set out on a scheme to explode the disadvantaged business enterprise program. They didn't have a political objective. They had a financial objective, which was to get PennDOT's money, which is exactly what Kelly is telling us. The objective of their scheme was to get PennDOT's money. And indeed, they did get PennDOT's money. And is money property within the meaning of the wire fraud statute? And the answer is absolutely, positively, yes. And the fact that PennDOT got something of value in return is beside the point. What PennDOT got was not what it wanted. It wanted something different. Well, let me ask you this question right along the point that you're making, because I think you're essentially embracing Carpenter, if I'm understanding your argument. And Carpenter says that, this is at page 25, the Wall Street Journal's contractual right to its employees' honest and faithful service was an interest to Ethereal in itself to fall within the protection of the mail fraud statute. So how do you draw a distinction between that instance, which is too Ethereal, to this, which you say is practical and applicable? Because what you ask is, what is it that the defendant obtained by its scheme? The object of the scheme was to do what? Was the object of the scheme to obtain, the, to deprive the victim of honest services? That's Ethereal. The object of this scheme was, as Judge McKee said, not to explode the DBE program, not to punish the governor, the mayor of a New Jersey city. The object of this scheme was financial, was to get money. And the fact that why related to a non-financial term doesn't change the object of the scheme, from, right? But Carpenter is focusing on what's the desire. The desire is the Wall Street Journal to have someone who is going to provide honest and faithful service. What you told us was material here was we want a DBE. We didn't get a DBE. I don't think that's how we spent like the first half of the argument. So, you know, I'm looking at Carpenter and I'm looking at what you said earlier and I'm saying, Ooh, that seems like it's not similar. It seems like it's exactly the same. Well, no, no, no, your honor, because the materiality is different from the property interest. I can tell you a material lie that has nothing to do with the property interest. And by that material lie, I obtain money or property. So imagine somebody shows up to the lawyer for a decedent and says, I'm the heir of your client. That's a material lie. By means of that material lie, the defendant obtains property, namely the decedent's estate. So what is being obtained is money or property by means of what? By means of a materially false representation. In my hypothetical case, it's a materially false representation about the identity of the person receiving the money. In this case, it was a materially false representation about the identity of the person receiving the money. They said we have a real DBE when they had an imposter DBE. In my hypothetical, the person said I'm the real heir when the person was the imposter heir. So the statute doesn't say the lie has to be property. It says the thing obtained, the object of the scheme must be to obtain something that is material property. That is the question. Well, let me give you a hypothetical. Let's focus on the bridges. And what's delivered to you as a result of this scheme is a materially better bridge. I know it's a paint job, but let's assume that it was a better grade. Let's assume they use a better grade. Yeah. And however you measure this, it's materially better. There's a benefit that PennDOT gets that it wouldn't have gotten in any other situation. I presume to be consistent, your answer should be it doesn't matter whether you get a materially better bridge at the end of it. It just matters that you got the project to begin with because there was a material term that we had in mind. We want to deal with a DBE. We didn't get to do that so that the entire project is one in which you can say we suffered a loss. Do I have your argument down? I think very close, your honor. Here's what I would say. I would say that at the question of whether a fraud has been committed, if the defendant obtains the contract by means of a false and fraudulent material representation, then the statute is satisfied and a fraud has been committed. A fraud has been committed. I think that's the problem. Is it a 371 fraud or is it a fraud under which you charge? Well, no, but it's a wire fraud fraud because the wire fraud statute covers schemes, which Judge Greenaway's hypothetical is to obtain money or property, which Judge Greenaway's scheme is to obtain PennDOT's money by means of a fraudulent pretense representation or promise, which is satisfied. But if in fact what's delivered is better than what PennDOT expected, that becomes a sentencing issue. That becomes a question of how do we measure the loss? And it may be that the loss amount in Judge Greenaway's hypothetical is either zero or is reduced because what PennDOT got was worth more than what it expected. But if the representation about who was going to be performing the service was material to PennDOT, then the act of obtaining the contract is a wire fraud. So if I understand you correctly, your focus should strictly be on what the defendant got and not what the victim in this case lost. Because the victim didn't lose anything here, really. It lost the benefit of the bargainer, the DBE piece. But your focus is on the fact that the defendant got a lot of money and the object of the scheme was to get to the money. And the victim paid money that it would not have paid had the truth been told. It would have paid it to someone who actually was going to do what these defendants promised they would do. So in this case, the two are mirror images of each other. But the statute really speaks to whether the property that the defendant obtains is property in the hands of the victim. And here it was money. And in PennDOT's hands, money is money. I mean, money is property. So that's the statutory question. And that's why Granberry is correctly decided. That's why Leahy is correctly decided. That's why the electronic waste case is correctly decided. That's why all of the cases in that long, long line of cases since the beginning, if it's a fraud in the inducement and it's a material fraud and it's used and the wires are used, it falls within the federal wire fraud statute. If we go with Ms. Mathieson, you're telling us we're going to create a circuit split? You're clearly going to create a circuit split. You're going to create a circuit split within this own circuit. Because Hadiki and Hurd all say the same thing, that you don't take the difference between what the victim was promised and what the victim got and subtract them to determine whether the statute's satisfied. You do do that at the sentencing stage. That's a whole different question. But to determine whether a wire fraud has been committed, you simply ask the question, was the victim induced to part with some property interest, money or property, by means of a false or fraudulent pretense representation or promise? And here, straightforwardly, as cases at least starting with Roe establish, that's exactly what dozens of other cases cited in our brief are not distinguished by the defense. You're looking in my question to you from the footnote. And Kelly, you're looking at loss in terms of failure of material term of the contract, as opposed to whether or not they got. I know your position is they didn't get what they paid for. And I certainly write about that in terms of the totality. But the loss is the failure of a material part of the contract. Doesn't matter whether or not the thing which makes it material is in and of itself a tangible property interest. It's still a loss. And if the objective of the scheme was the byproduct of that, the loss of the MBE, that doesn't matter. It's the victim's loss, which you can interpret that language to say. You can also interpret it the way Ms. Patterson is reading it. Except that what the Supreme Court clearly says in McNally is this case was not tried on that theory. We're not saying it couldn't have been. It simply was never tried on that theory. Our case was. McNally would be helpful if we tried this case as a McNally case. But we didn't. This case was tried as a money or property case. And it was money and property. And to be very explicit, the money was the $120 million. And the property part was a property interest by PENDOT in the disposition of its money. That's where I lose you. The first part seems to me pretty solid ground. Because when we get into the latter part, in terms of the disposition of its money, that almost seems more like the kind of Cleveland regulatory or supervisory interest. It clearly doesn't fall under the statute. And here's why I say that. You go back to Roe and all of the cases arising from it, and Granberry, and Leahy, and the electronic waste case. One of the longstanding incidents of ownership of anything, one right is the right to exclude others, which this court validated in Al-Hadithi. Another property right in owning a thing is the right to choose how to dispose of it. So if I own a thing- That's a supervisory interest, though. But it is a property. It is a longstanding recognized property interest. The right to dispose of a thing which is property. The right to dispose of a thing that's not property is not a piece of property, land or money, for example. One of the sticks in that bundle of rights that ownership represents is the decision about how to dispose of the thing that you own. So if I own money, I have the right to dispose of it as I see fit. And if I am induced to dispose of my money by means of a false pretense representation or promise, for example, that the bus driver that I'm paying is not a felon when he is, that the electronic waste will be disposed of in an environmentally friendly way when the defendant knows that it won't, when a contractor is going to hire a DBE when he knows that he will not, then I have been deprived of a longstanding recognized property right. It's a property right that this court has recognized, that the second, that the seventh, that the eighth. It's a property right. My concern is it seems more like a, by definition, a supervisory right. By owning the property, you have the right to, as you're saying, exercise control of it and slash not a tangible money right. The tangible thing here seems to be the money that was paid out, not the right to dispose of the supervisory thing that came with it. Well, I'm going to dispute the supervisory regulatory characterization because that's a right that every property owner, whether they're public or private, has. So when Microsoft enters into a contract with somebody to build at a new headquarters and they specify that a certain percentage of it is going to be by a minority contractor, they are exercising the exact same rights that PennDOT did here. PennDOT wasn't acting as a government entity in this regard. It was acting as an owner of property, property being a bridge, but more pertinent to our case, property being the money that it was going to spend to get its bridge repaired. As the owner of money, it has the right to dispose of it as it wishes. That is a property right recognized for hundreds of years, if not more. That is a fundamental right of ownership of money. How am I going to spend it? And if I am defrauded, if I choose, if I am forced or induced to spend it, through fraudulent representations and the wires are used, et cetera, et cetera, it falls within the wire fraud statute and always has. And McNally didn't change that, and Zauber didn't change that. None of those cases changed it. Kelly did refer to that kind of interest though. I'm going to look right at it. They're saying Kelly exercised the regulatory rights of, quote, allocation, exclusion, and control. To me, you've got a much firmer ground focusing on the money as opposed to the disposition of it. But then again, Ms. Matthews' point is, well, that's exactly right in terms of the loss of the money. There wasn't a loss of money. What was lost here was who got some of the benefit of the money, and that is not a tangible interest under the case. That's where we are. But the money is not, the money doesn't become unlost because the defendant returns value. That's the, that is the import of that very long line of cases, starting with Judge Hand in 1932. You don't, the loss that we're talking about is not a net loss. Well, the value, you're actually saying defendant did not return the value because something was very crucial to the letting of the contract they didn't get, so they didn't return the value. They did not, in fact, return the value. But even in a case where the value is returned, those cases all stand for the proposition that you don't look at the value of the quid pro quo, you look at whether money has been, a transfer of money has been induced by means of false pretenses, representations, or promises. If you will endure with me, I would like to briefly address the spillover issue. That might be helpful. Go ahead, if you could do that briefly. And I will promise you I will be far more brief than I have been so far. That's not much of a promise. Oh, my God. Two points for readaway. Under the Hogwarts scoring theory. If you're going to set yourself a goal, it's at least, It'll be less than 47 minutes, that's not great. So having tried the case, which Matthewson didn't, all counsel who were there tried both sets of charges as one case. And the reason is they were one case. The things that made the fraudulent representations fraudulent were the exact things that made the fraudulent scheme fraudulent. Namely, that there was a fraudulent inducement to obtain the contract. And that there was a fraudulent series of fraudulent representations to retain the contract. And the nature of the contract, how it came about, is all critical to establishing the materiality of the false statement. Unless you know, I mean, as the Court knows from this lengthy debate that we've had, the contract history, how the thing is bid, tells you what's important to pend on. That if the fact that there was this two stage process explains how it is that having a DBE is so important. The defendants raised good faith as a defense to every single count. Both the wire fraud and the false statements and all of the evidence that is relevant to good faith is relevant to both the wire fraud counts and the false statement count. Likewise, the conspiracy, all the evidence of conspiracy is relevant to both. The government is entitled to prove a conspiracy in order to, for example, obtain the benefits of Pinkerton, even when no conspiracy is charged. The only evidence that would not have been not only admissible, but actually admitted that was not functionally critical to all of the charges is the evidence of the interstate wiring. The government would not have had to prove that the wiring was interstate. It still would have had to show that the false statements were transmitted, but it would not have had to show that it crossed the state line. So this is another 18 day trial in your view, if we were just talking false statements. 18 days, seven hours and 56 minutes. Yeah, we would, I mean, we would save a few minutes, but that saving that there's nothing in that savings that was in any way prejudicial. This was really two sets of charges aiming that got it exactly the same conduct. That's how it was presented in the indictment. I mean, the fraudulent statements were overt acts charged in the indictment and all of the paragraphs outlining the fraudulent scheme were incorporated into the indictment. I did cut Ms. Matthewson off, did it after an hour or so, but let me return the paper and impose upon you to let us hear from your colleagues. Mr. Bat, you was your five minutes, I believe. Go ahead. Your Honor, I'll begin where Judge Restrepo asked me to begin, if I may sort of meta reserve. No one listens to Ms. Restrepo. Why are you going to begin where he asked you to begin? Your Honor's presiding, if Your Honor would like me to. No, that's all right. I'll defer to my colleague. I just want to make sure I have time to respond to Mr. Shapiro's points as well, particularly on this fraudulent inducement and right to control theories. So let me start with Judge Restrepo invited, and that is with Nagel and lost. And Judge Restrepo, you asked, why are we not bound by Nagel? The court is bound by Nagel and Nagel is our case. And here's why. The government approached Nagel with Tulio. So Tulio said motion to dismiss was properly denied because the services PANDOT expected, which Tulio called the fundamental benefit of its bargain was construction by a DBE. And therefore having received construction by a non-DBE, the agency says Tulio got zero and was deprived of property. Of course, that's predicated on the idea that obtaining is not required and other things that have undermined Tulio. But when Tulio arrives at Nagel and the government says, and I agree with this, that the two are on all fours, even though one dealt with whether an offense was charged and the other dealt with sentencing, both contexts require pecuniary harm. The government says, Tulio tells us that the agency in Nagel got zero because it wanted services from a DBE and it got services from a non-DBE. And the third circuit says no. And here's what's absolutely vitally important because it goes to right to control, which by the way, was also charged in Nagel and not charged here. And it goes to- Not mentioned in the opinion. Nagel never mentioned right to control. Correct, your honor. I went back to the indictment. Although I will say that when one looks into the case law, that's the underpinning here, and it's really the second circuit row case that it's progeny, which I'll address as well. That's where benefit of the bargain comes from in this context. It really is this right to control theory that the agency had the right to make its decisions based on accurate information, make its spending decisions based on accurate information. But to go back to Tulio and Nagel, Tulio says the services are worth nothing because they wanted a DBE and they didn't get a DBE. Nagel says that's exactly wrong. And Nagel describes the services rendered as the construction, even though the construction was delivered by a non-DBE. And Nagel says credit the value of those services to the same extent as you would credit the value of services from a DBE. Fair market value is the fair market value of the construction. And the fact that the agency didn't get the DBE participation it wanted does not reduce the full benefit of its bargain because its interest in having a DBE, this is not a direct quote, its interest in DBE participation was not fulfilled. But what was missing there? This court said in a precedential opinion, Tulio is cursory, we reject it. It said the basis of the bargain, one basis of the bargain was DBE participation. But what it rejected was what the second circuit called and Tulio called the fundamental basis of the bargain. So this may sound like wordplay, but the government keeps invoking Roe and its progeny. And that's where the basis of the bargain thing comes from. The fundamental benefit of the bargain, every second circuit case says, and limits Roe, are the economic aspects of the bargain. There are other benefits of the bargain, non-economic aspects. The court recognized that and Henry said not everything that's a valuable condition of a contracting process is a traditionally recognized form of property. So when Nagel rejected Tulio's conclusion that services from a non-DBE are worth less than services from a DBE and said the services have the equivalent value, that is two important points here. One, yes, of course, PennDOT did not get everything it wanted. It did not get DBE participation. But PennDOT's interest in the important DBE program is an interest it holds as a sovereign in the public interest. What PennDOT did get is the economic benefit of its bargain, and that's the services rendered. And as we were the wordplay of defining the services to include the intangible interest as well, even regulatory compliance interest held by a sovereign, then one's collapsing this distinction that Congress has maintained for 100 years and that the Supreme Court keeps enforcing. So Nagel on the loss amount is important for numerous reasons, including the fact that, again, it said to credit the full value of the services rendered regardless of the fact that they were not provided by a DBE. And importantly, having connected this to the Tulio analysis of what a charged offense is, Nagel also reveals that there was no economic harm to PennDOT. The scheme impaired its interest in the DBE program, but it got the services it wanted, and those services Nagel defined as the construction promised under the contract. That's actually perfectly consonant with the Second Circuit cases. So for purposes of sentencing, the loss was zero? It was, it was. That's your position, right? Absolutely. And you know what, that's exactly, here's what happened to Nagel on remand. In Nagel on remand, the district court said, yes, you know what, I agree that loss to the agency was zero. In fact, the district court, in this case, Your Honor, found restitution was zero. And the restitution doesn't always have to match loss when we're talking about actual loss. And of course, restitution measures actual loss. They do have to match. So the court acknowledged, I mean, really the district court said it straight out. What PennDOT lost, she said precisely what PennDOT lost is its interest in DBE participation. And then she proceeded to, quote, translate that interest into dollars. But the fact that we can put a number on something, like we do, and juries do in emotional distress and civil cases, that doesn't make it into pecuniary harm. And Nagel shows that, you know, when Nagel says to, when Nagel tells district court on remand, to the extent possible and where relevant, keep in mind, literally it says, keep in mind, to the extent possible and where relevant, the injury to the DBE program. So what happens, I mean, and Your Honor knows just having been on free, you know, this concept of keep it in mind if you can, if it's relevant, that's not a guideline calculation. That's telling the court to exercise its discretion. So what happens on remand in Nagel is significant, too, because it's another important difference in the way this case was charged versus how it could have been charged as in Nagel. So on remand from this court in Nagel, the district court agrees, you know what, you're absolutely right, zero loss to the contracting agency because the services received are worth the money paid on the contract. However, in Nagel, the government had a charge it didn't have here. It also charged a deprivation of property from the legitimate DBE that would have gotten the contract. And the district court said, and remember in Nagel as well, factual difference here. In Nagel, 100% of the contract was supposed to go to a DBE. The agency thought it was working with the DBE. They were just pretending to be a DBE. Here, the agency knew it was working with the majority contractor. It just wanted them to buy some supplies from a DBE. So in Nagel, the court says, okay, there's also a DBE of money, the money that they would have earned if you hadn't stepped in and pretended to be a DBE. The court takes that number, uses the defendant's profit as a proxy for what the legitimate DBE lost. And then that's what gets affirmed in this court in the unpublished decision that goes up a second time. So in this case, the government never alleged any harm to legitimate DBEs. It never attempted to identify any. And it expressly disavows any idea that the profit a DBE would have earned is any sort of a proxy for loss here. But what it doesn't find in Nagel is the remotest suggestion of economic harm to the contracting agency. In fact, Nagel says the trying to smush this important governmental public interest, why try to smush it into the strictures of the guidelines rather than conceptualize it in the sound discretion of the sentencing court? As this court repeatedly reminds district judges, they're not bound by the guidelines. And they need to calculate the guidelines in accordance with the language that commission has prescribed and Congress has approved. But here, that means actual loss. And the actual loss to the agency was zero. That does not tie the district court's hands in terms of exercising its sentencing discretion. When the court asked about ill-gotten gains, the court knows that Nagel is a really good example of this. Because the first thing the district court did in Nagel and what got it reversed was use the value of the contract and try to calculate the idea, try to use this idea that the defendants would not have gotten the contract but for the fraud. And that's what this court reversed and said, no, they delivered the services they promised to deliver at the price they promised to deliver them. There's the idea that any inducement to contract, any material representation having nothing to do with property bound by a reasonable person standard, that's not how we define a federal property crime. I didn't interpret Mr. Spear as making that argument at all. I think he was responding to my quote from that last sentence from that footnote and saying that the object here was the money and the mechanism, the coincidental almost way that they went about getting the money was... His statement that a depriving is not required as long as there's an obtaining, that's the holding of McNally. That is on McNally, page 358, the court long ago stated that to defraud refers to wronging one in his property rights. And that is required. Obtaining is not and depriving has to be this right to control. We will really have to beat that into the ground. No one said anything about forfeiture and I don't want to open up again to direct and maybe you could just briefly address issues you're seeing with forfeiture. And then Mr. Spear, if you don't mind, if he's trying to use the object, we'll give you time, but if you don't mind, submit a 28-J letter in response to anything Ms. Matheson might say on the forfeiture issue that we will get out of here before the next interval on terms of Equinox. And this actually ties somewhat to the right to control. So the forfeiture point is both legal and factual, Your Honor. First, the profit that the joint venture earned and that Gear Alpha earned does not fit the statutory definition of proceeds because there's no causal link between noncompliance and the profit they earned. There are regulations, we've cited them in the that they very well may have gotten the contract, even if they hadn't been able to make the participation goals. And the first contract was thrown out. So how could they possibly have made the contract without the participation? Oh, no, Your Honor. I'm glad that Your Honor asked because no, Mr. Shapiro was referring to a completely different incident. There was testimony about what has happened in cases where there is an inability to make the contract goals. But that whole process is an extremely lengthy process governed by administrative reconsideration, right? There's absolutely no way to know what would have happened. And frankly, Congress has repeatedly instructed the Department of Transportation that it may not deny to low bidder majority contractors contracts they otherwise would have gotten as long as they make a good faith effort to comply. And Mr. Shapiro admits in his briefing that we have no idea whether PennDOT would have accepted this bid at the stated price. Okay, Your Honor, I see you off track here. So maybe we can get back on track. So that's a legal question here because the court made absolutely no finding of but-for causation and no finding of but-for causation is possible given the regulations. And that's a factual failure as well, both given the regulations and given the record here. Moreover, the government did not carry a substitute assets burden. The government kind of changes the subject here. The district court cited subsections A, B, and E, but nothing in the record supported the requirements of those sections. And the court, again, made no effort to find that there had been, for example, an exercise of diligence to locate property, that any property had been transferred to a third party or commingled. The government made no effort to trace and no showing at all. Instead, in this court, it actually cites a completely different subsection trying to say that the property has diminished in value, but that doesn't apply to just the fact that a business is operating and spending money. And finally, on proportionality, the government simply incorrect when it says that because this is a criminal case, there's no Eighth Amendment violation. That's backwards, Your Honor. And where we stand now as well is not only has Alpha been held to forfeit the entirety of its profit in this case and really driven to the brink of bankruptcy in a case where $170,000 went to a not legitimate DDE instead of to a legitimate one. The government recently dismissed charges against the other co-defendants who had been of the forfeiture. So that just exacerbates the- But what I don't understand, and I will ask Mr. Schroeder to respond to this in his 28th day letter, talk about a windfall in government. They paid these millions upon millions of dollars to get a paint job, a construction job done. They get the job done. Everyone concedes that it is a quality job. And then they want back the money they paid for the quality job. That's an amazing concept. It'd be different if the comes right back into the government. I don't quite get that. It's like someone builds me a house. There's a problem with who built the house, but I love the house. Give me back the money I paid for the house and the lot and my attorneys fees. It's just bizarre, but we- Yes, Your Honor. And I think that also goes to Mr. Shapiro's theory of this right to control theory that somehow depriving PennDOT of the right to make decisions over how its money was spent is the same thing as stealing its money. He referred to the possibility of an intra-circuit split. Daubert is good law. Daubert literally says that the right to control how money is spent in contracting decisions is not a property right. There was an intra-circuit split, Your Honor. There was a jury instruction in Barone that said the right to accurate information when making discretionary economic decisions is a property right, and the right to control when spending decisions is a property right. That created an intra-circuit split with Daubert, and we know what happened with Barone. Barone's not good law. So when Mr. Shapiro invites the court to adopt a right to control theory that was not charged here, unlike Nagel, no instruction to the jury, unlike Nagel and unlike Barone, and was explained in Barone, contrary to Daubert, presented to the Supreme Court, and rejected in Kelly, the court should not only avoid that intra-circuit split, but it should not repeat the mistake that Barone ventured, because at this point, the Supreme Court has told us consistently, property fraud requires leasing a victim of money, stealing its money, and taking it for a third party. And none of the theories that the government's articulating here or that were articulated below cold water, any one of them requires reversal, Your Honors, because the jury instructions permitted conviction on all of them. And truly, Your Honors, judgment of acquittal is warranted because as the government admits, these interests are non-economic. So in the words of Cousin Vinnie, you're saying the defendant's case holds water. It does, Your Honor. I was deliberately channeling him, but yes. Okay. Thank you. Thank you. We'll take the matter into advisement. As I mentioned, we'll ask for transcripts. I want to thank counsel. I don't think either of you are good in front of me before. Mr. Shapiro, I'm delighted that the office, I know it's not the policy, but the attorney who tried the case to come in to argue the case. I know when I was there, that was a really very rewarding experience. And I know that doesn't usually happen. Somehow you elbowed Zosmer out today, but I'm glad the trial attorney, it's very helpful to have the trial attorney in arguing the case. And Ms. Masterson, as I said, I don't know if you're right or not, but your argument was absolutely superb. And I commend you both for the quality of your arguments. Thank you very much. And hopefully we'll see you again on another case. Thank you, Your Honor. Thank you. Take care.